Estate of Morgan J. Hammers, Deceased, Grace P. Hammers, Executrix v. Commissioner.
Estate of Hammers v. Commissioner
Docket No. 111373.
United States Tax Court
1943 Tax Ct. Memo LEXIS 79; 2 T.C.M. (CCH) 934; T.C.M. (RIA) 43459; October 19, 1943
*79 John D. Walker, Esq., for the petitioner. Robert S. Garnett, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, J.: The Commissioner has determined a deficiency of $13,171.43 in the income tax of Morgan J. Hammers, deceased, for 1936. The deficiency results in principal part from the Commissioner's determination that the decedent realized a taxable gain in 1936 from the receipt of shares of stock which he acquired upon organization of the issuing company following a bankruptcy proceeding under section 77-B of the Bankruptcy Act, which gain decedent omitted from his return for 1936. Findings of Fact 1. Petitioner is a resident of Stamford, Connecticut, and is the duly appointed executrix under the last will and testament of Morgan J. Hammers, deceased, who died a resident of Stamford on May 9, 1940. Hammers' individual income tax return for 1936 was filed with the collector of internal revenue for the district of Connecticut. 2. The notice of deficiency upon which this proceeding was brought was mailed to Morgan J. Hammers on March 9, 1942, and received on or about that date by petitioner. 3. For many years prior to his death Hammers had been a man *80 of outstanding and recognized ability in the oil burner business. 4. In 1935 Electrol, Inc. (a Missouri corporation hereinafter called Electrol-Missouri), then engaged in the oil burner business, found it impossible to meet its maturing obligations and was in financial distress. 5. Proceedings were instituted in the United States District Court for the District of New Jersey seeking a reorganization of Electrol-Missouri under that part of the bankruptcy law known as 77-B. 6. All of the stock of Electrol-Missouri was owned by Electrol Corporation of America (hereinafter referred to as Electrol-America). 7. As part of the proceedings under section 77-B it was proposed and agreed between Electrol-America and Petroleum Heat & Power Company, Inc. (hereinafter referred to as Petro), by written agreement, that Petro would acquire the deferred and current claims against Electrol-Missouri and assign the same to a new corporation to be organized in connection with the reorganization under section 77-B. Petro was to receive certain stock in the new corporation to which all of the assets of Electrol-Missouri were to be transferred. Certain stock was also to be issued to Electrol-America. Said *81 agreement was dated April 18, 1935, and shows in detail the various steps to be taken in reorganizing Electrol-Missouri. 8. The foregoing agreement was presented to the District Court as part of the plan of reorganization in April, 1935. 9. The District Court entered an order permitting Electrol-Missouri to remain in possession of its assets and outlining the terms under which the business would be continued. 10. On February 8, 1936, Hammers and George P. Robinson entered into a written agreement with Petro, which agreement was modified by an agreement dated March 9, 1936, and by a letter from Petro dated April 16, 1936. 11. In the agreement of February 8, 1936, it was recited that Petro had agreed to and had the right to acquire the assets of Electrol-Missouri; that Hammers and Robinson desired to acquire the assets of Electrol-America; the agreement then provided that Petro was willing to allow Hammers and Robinson to make the necessary arrangements to acquire the assets of Electrol-Missouri substantially in the place of Petro; that by reason of the agreement Petro would acquire the Zoro patent estates and obtain a fuel oil contract with the proposed new corporation; and further *82 that reorganization might result in keeping Electrol-Missouri in operation or in forming a new corporation to take over the business. The agreement then provided that Hammers and Robinson would, within 30 days, attempt to acquire from Electrol-America (1) all of its capital stock; (2) all of its claims against Electrol-Missouri; and (3) all of its rights under the agreement between it and Petro dated April 18, 1935; that Hammers and Robinson would also endeavor to acquire the claims of the creditors of Electrol-Missouri; that if Hammers and Robinson were successful Petro agreed to assign to them all of its rights under the agreement of April 18, 1935; that in such event Hammers and Robinson would take the necessary steps to carry through a reorganization of Electrol-Missouri; that Petro would receive the interest of Electrol-Missouri in the Zoro patent estates and a fuel oil contract with Electrol-Missouri or a new corporation; that Petro would be released from all obligations; that Petro would be repaid for sums advanced on account of the reorganization; and that all matters to be performed would be performed within 30 days. 12. In the agreement of March 9, 1936, the agreement of *83 February 8, 1936, was reviewed so far as necessary and it was then recited that Hammers and Robinson could not acquire the claims against Electrol-Missouri without the assistance of Petro to the extent of Petro's issuing notes to said creditors as contemplated in the original agreement of April 18, 1935. The agreement then provided for an extension of 30 days; the agreement of February 8, 1936, was amended so that Petro would issue its notes to the creditors of Electrol-Missouri and Electrol-Missouri, or a new corporation, would give its covering notes to Petro - all notes to be payable with interest in equal installments over a period of five years; that there would be deposited with an escrow holder as collateral security for the payment to Petro of said notes 75 percent of all the authorized common stock of Electrol-Missouri, or a new corporation, and that no further common stock would be issued to the detriment of Petro's then position; the stock was to be endorsed in blank and to be delivered to the escrow holder as collateral security for the payment of the notes issued by Petro to said creditors; the right to vote stock would remain in the record owner; that if any default *84 were made in the payment of the notes of Electrol-Missouri, or a new corporation, for a period of 30 days, the stock in escrow would be delivered to Petro, whereupon Petro would become the owner thereof and entitled to have the stock registered in its name; that if Petro acquired the stock by reason of such default Petro would not be required to give any credit on the indebtedness of Electrol-Missouri, it being agreed that in such event the stock would be valueless, except to permit Petro to liquidate in order to protect its claims. The details of the payment of the notes to Petro were agreed upon and it was agreed that upon payment of the first annual installment 10 percent of the escrowed stock would be released, that upon payment of the second installment an additional 10 percent of the stock would be released, and upon payment of the last installment the remaining 80 percent of the stock would be released. The Manufacturers Trust Company of New York was nominated and appointed as the escrow agent. Other necessary amendments to the February 8, 1936, agreement were made and an agreement was made with respect to the issuance of preferred stock and common stock and the rights of holders *85 thereof in Electrol-Missouri, or the new corporation, the holding of annual meetings and the furnishing of financial statements. 13. By letter dated April 16, 1936, Petro agreed to accept the return of its own notes in payment of the notes due to it by Electrol-Missouri, or a new corporation, at any time during the life of the notes. 14. Hammers and Robinson presented a plan of reorganization incorporating therein all their agreements with Petro to the District Court, such plan of reorganization being dated March 30, 1936. The plan contemplated the formation of a new corporation with preferred stock of not less than $50,000 par value and 200,000 shares of common stock without par value (later amended to common stock of a par value of $1 each); the issuance of not less than $50,000 par value preferred stock for cash; the issuance of 200,000 shares of common stock to Hammers and Robinson and their associates in consideration of their assigning to Electrol-Delaware (the new corporation) all their rights to acquire the assets of Electrol-Missouri; the assignment by Petro to Hammers and Robinson of all its rights under the agreement of April 18, 1935; the transfer of assets of Electrol-Missouri *86 to Electrol-Delaware; the payment in cash of current claims against Electrol-Missouri; the issuance of Petro's notes to the other creditors of Electrol-Missouri such notes to be secured by similar notes of Electro-Delaware and the placing in escrow of 75 percent of the common stock of Electrol-Delaware; payment by Electrol-Delaware of $45,000 in cash to Electrol-America; the repayment to Petro of $25,000 advanced on trust certificates; assumption by Electrol-Delaware of certain liabilities and obligations as set forth in the agreement of April 18, 1935. 15. The plan of reorganization was consented to by all parties in interest and was approved and confirmed by the District Court by order entered May 11, 1936. 16. On May 28, 1936, the board of directors of Electrol-Delaware accepted a proposal made by Hammers and Robinson, by letter dated May 1, 1936, offering to sell and assign all of their rights to acquire the assets of Electrol-Missouri, all of their rights under the contracts of April 18, 1935, February 8, 1936, March 9, 1936, and April 16, 1936, and offering to designate Electrol-Delaware as the "new corporation" under the plan of reorganization. 17. Electrol-Delaware on May *87 28, 1936, voted the issuance of 200,000 shares of its common stock to Hammers and Robinson and their associates as the agreed consideration for the transfer of all of said rights of Hammers and Robinson. 18. Electrol-Delaware on May 28, 1936, agreed to and did issue its notes to Petro for $100,779.89, payable in equal annual installments over a period of five years, with interest at four percent. Each note provided that all notes would mature on 30 days' default in the payment of any one as provided in the agreements of February 8, 1936, and March 9, 1936. 19. On May 28, 1936, Electrol-Delaware issued 200,000 shares of common stock of which 80,000 shares were issued to Hammers. 20. On May 28, 1936, all of the various documents to be executed and delivered in order to consummate the transaction whereby Electrol-Delaware would acquire all of the assets of Electrol-Missouri, together with the right to the exclusive use of the name "Electrol," less the interest of Electrol-Missouri in the Zoro patent estates, plus the acquisition of an oil contract with Petro, were executed and thereby all of the details of the proposed transaction were carried out and performed. 21. Hammers on May *88 28, 1936, executed a voting trust agreement whereby he became the voting trustee for the 80,000 shares of common stock of Electrol-Delaware issued to him and 40,000 shares of Electrol-Delaware issued to Robinson. 22. The 80,000 shares of common stock of Electrol-Delaware originally issued to Hammers and the 40,000 shares issued to Robinson were immediately on May 28, 1936, transferred by them to Hammers as voting trustee. All of Hammers' stock as represented by voting trust certificates, issued by him under the voting trust agreement, and as a necessary and agreed part of the whole transaction were immediately placed in escrow with the Manufacturers Trust Co. as security for the payment of $100,779.89 then owing on said notes from Electrol-Delaware to Petro. 23. In the voting trust agreement Hammers, as such voting trustee, agreed to act for a period of ten years, terminable prior thereto by the payment of the obligations of Electrol-Delaware to Petro, or by the death of the voting trustee, or by 30 days' default in the payment of Electrol-Delaware's obligations to Petro. Hammers further agreed to issue voting trust certificates representing the common stock placed under the voting *89 trust and to deliver proper certificates of capital stock upon the surrender of the trust certificates, to vote the voting trust stock held by him in the exercise of his best judgment, to deposit voting trust certificates representing not less than 51 percent of the common stock of Electrol-Delaware with the escrow holder in lieu of certificates of common stock pursuant to agreements with Petro dated February 8, 1936, and March 9, 1936, together with sufficient outstanding common stock to total 75 percent of all outstanding common stock of Electrol-Delaware, said escrow holder to be the Manufacturers Trust Co. pursuant to an escrow agreement executed simultaneously with the voting trust agreement; also to deposit with the Manufacturers Trust Co. as custodian all of the shares of common stock deposited with him as voting trustee in a special custodian account at the Manufacturers Trust Co.
24. Pursuant to the agreements of February 8, 1936, and March 9, 1936, Hammers and Robinson, Petro and Manufacturers Trust Co. entered into an escrow agreement by which Petro consented to the substitution of voting trust certificates, representing 120,000 shares, in place of common stock of a like *90 amount. 25. Said escrow agreement, after reciting the relevant facts, provided for the deposit with the Manufacturers Trust Co. of 30,000 shares of stock and voting trust certificates equivalent to 120,000 shares of common stock of Electrol-Delaware, the Manufacturers Trust Co. acknowledging receipt thereof. The agreement further provided for the payment by Electrol-Delaware to Manufacturers Trust Co. of the amount necessary to meet its note obligations to Petro; for the release of 10 percent of the escrowed stock upon payment of the first annual installment of said notes, a release of 10 percent of the escrowed stock upon payment of the second annual installment, and a release of 80 percent upon final payment of the notes aggregating $100,779.89; and further that if Electrol-Delaware's said note obligations to Petro are defaulted for a period of 30 days the Manufacturers Trust Co., upon receipt of written notice of such default from Petro, is to deliver all of the common stock and voting trust certificates held by it under such an agreement to Petro, whereupon Petro would become the absolute owner thereof and the escrow agreement would terminate. The agreement further provided that *91 if Petro shall become the owner of such stock it would be valueless except to permit Petro to exercise control of the operation or liquidation of Electrol-Delaware in order to protect the indebtedness due to it. 26. In June, 1936, a final report was made to the District Court reciting the steps taken in completing the plan of reorganization approved by the court. The report was approved and a final order was entered by the District Court finding that all of the undertakings of the various parties contemplated by the plan of reorganization had been performed and the case was thereupon closed in the District Court. 27. On November 13, 1936, Petro gave permission to Electrol-Delaware to issue an additional 60,000 shares of common stock for the purpose of raising funds with which to pay off the indebtedness of Electrol-Delaware to Petro represented by notes of Electrol-Delaware to Petro in the amount of $100,779.89, waiving the provisions of the agreements of February 8 and March 9, 1936, limiting the issue of common stock to 200,000 shares while Electrol-Delaware was indebted to Petro. Petro agreed that upon the payment of said notes by Electrol-Delaware the escrow agreement would *92 be terminated and the stock and voting trust certificates held thereunder would be released. 28. By letter dated December 9, 1936, Petro advised Manufacturers Trust Co. that Electrol-Delaware's note obligations to Petro had been fully paid and instructed the Manufacturers Trust Co. to release the stock and voting trust certificates held thereunder to Hammers and Robinson, or their nominees. 29. The escrow agreement was terminated and the stock and voting trust certificates held thereunder were released December 11, 1936. 30. By virtue of the agreements and transactions between Petro, Hammers and Robinson and Electrol-Delaware the latter, in order to obtain and acquire the assets of Electrol-Missouri (less the Zoro patent estates) and the right to the exclusive use of the name "Electrol," found it necessary to obtain the sum of $50,000. 31. This sum was obtained by the sale of 500 shares of preferred stock on May 28, 1936, at its par value of $100 per share. 32. Said $50,000 was the only additional or new money provided to Electrol-Delaware, the new corporation. 33. The $50,000 cash thus received was expended at once by the payment of $45,000 to Electrol-American and $5,000 for *93 expenses of reorganization. 34. As of May 28, 1936, when Electrol-Delaware began business, its assets, aside from its name and fuel oil contract with Petro, exactly balanced its liabilities plus the preferred stock issued. 35. On the books of Electrol-Delaware the so-called fuel oil agreement with Petro was set up at a value of $50,000 to record the issuance of 200,000 shares of common stock. An additional entry was then entered valuing the trade-name at $150,000. These two items amounting to $200,000 represented the only claimed assets balancing the issue of 200,000 shares of common stock at $1 par value each. 36. The so-called fuel oil contract with Petro produced for Electrol-Delaware during the term of its operation the net sum of $11,069.50. The last receipts amounted to $84.97 for the period from April 1, 1940, to June 30, 1940, no receipts being received after that date. 37. Electrol-Delaware has never paid any dividends on its common stock. It paid dividends on its preferred stock to May 31, 1938. None thereafter. 38. Of the total outstanding original issue of 200,000 shares of common stock 150,000 shares thereof were subjected to the escrow agreement and there was available *94 for sale on the market prior to the termination of the escrow agreement only 50,000 shares of common stock. This was the only common stock which was freed from the provisions of the escrow agreement. 39. A total of 3,000 shares of the "free" common stock was sold on July 14, 1936, at a price of 5/8ths per share. This was the first known sale of the common stock. Thereafter the market increased and eventually the stock sold for as high as $5 per share and as low as 1/8th bid and 3/8ths asked. 40. After May 28, 1936, Hammers had no shares of common stock of Electrol-Delaware which he could sell until December 11, 1936, when the escrow agreement was released. 41. The common stock of Electrol-Delaware on May 28, 1936, had no fair market value. There was no fair market value for the stock of Electrol-Delaware held by the Manufacturers Trust Co. under the escrow agreement either on May 28, 1936, or at any time subsequent thereto. 42. After the termination of the escrow agreement on December 11, 1936, Hammers received back from the Manufacturers Trust Co. the voting trust certificates representing his 80,000 shares of stock and also the actual voting trust stock certificates. 43. The *95 business of both Electrol-Missouri and the new corporation, Electrol-Delaware, was in a highly competitive field, that of the oil burner business. Electrol-Delaware finally abandoned the oil burner business. 44. In December, 1936, Hammers, subsequent to the termination of the escrow agreement, sold stock in Electrol-Delaware from $1.87 1/2 per share to $3 per share, and paid a tax thereon upon a no cost basis. 45. On his income tax return for 1936 Hammers reported the receipt of the 80,000 shares of common stock of Electrol-Delaware but reported no taxable income from such receipt. In his deficiency notice the respondent has determined that the stock had a value of 62 1/2 cents per share at the time of the receipt and that the decedent received $50,000 taxable income from the receipt of the 80,000 shares. Opinion The proposed additional assessment for 1936 admittedly is barred by the statute of limitations, section 275(a) of the Revenue Act of 1936, the deficiency notice here having been sent more than three years after the return was filed, unless it is shown that the taxpayer omitted from his return for the taxable year an amount properly includible therein in excess of 25 percent *96 of the gross income reported in such return. Section 275(e) provides that where there has been such an omission the assessment may be made at any time within five years after the return was filed. The Commissioner's contentions are that the decedent received the 80,000 shares of Electrol-Delaware's common stock as compensation for services in organizing the company and agreeing to serve as its president; that the stock had a fair market value at that time, May 28, 1936, of at least 62 1/2 cents per share, or a total value of at least $50,000, all of which was properly includible in decedent's gross income. Petitioner contends that the shares in question had no fair market value when received by the decedent; that in any event they were received in a nontaxable exchange within the meaning of section 112(b)(5); that there was no omission from income in decedent's return for 1936 because of decedent's failure to report any gain from the receipt of the shares in that year, and that the additional assessment proposed in th deficiency notice is barred by the statute of limitations. We agree with petitioner's contentions that the 80,000 shares of Electrol-Delaware's common stock which *97 were issued to decedent on May 28, 1936, had no fair market value at that time and have so found. The decedent received the shares under an agreement which required him to place them in escrow for an indefinite period as collateral security for over $100,000 of the issuing company's promissory notes. Pursuant to this agreement decedent first transferred the shares to a voting trust of which he was the voting trustee in exchange for voting trust certificates and deposited both the voting trust certificates and the stock certificates representing the shares with the escrow agent, subject to the terms of the escrow agreement, where they remained until the notes were satisfied and the escrowed collateral released. The evidence is that there was no market for the Electrol-Delaware common shares at the time the shares were issued to decedent. In the first place this stock was of a highly speculative character. The business which it represented had just emerged from a bankruptcy reorganization. Presumably there had been a period of unsuccessful operation and consequent losses to the stockholders. Decedent's services in engineering the reorganization and his acceptance of the presidency *98 of the new company were among the chief factors upon which the other interested parties depended. Because of decedent's outstanding reputation in the oil burner field his continued services with the new company were regarded as essential to its success. The first sale of the Electrol-Delaware stock occurred about one and one-half months after the reorganization, when Robinson sold 3,000 of his free shares at 62 1/2 cents per share. Assuming, as the Commissioner has undertaken to prove, that a market might have been found for all of the free shares at May 28, 1936, it would not have applied to decedent's shares. Under the terms of the escrow agreement those shares were not available to the petitioner for sale or any other purpose. Although the respondent argues that there was no provision of the escrow agreement preventing the sale of the shares we do not see how any such sale could have been made. Decedent had in his possession neither the stock certificates nor the voting trust certificates. At best he could have done no more than make a contract for the sale of such shares. In Helvering v. Tex-Penn Oil Co., 300 U.S. 481, it was held that shares of *99 stock subject to similar restrictions had no ascertainable fair market value. In its opinion the court said: The court is also of opinion that the judgments must be affirmed upon the ground that in the peculiar circumstances of this case, the shares of Transcontinental stock, regard being had to their highly speculative quality and to the terms of a restrictive agreement making a sale thereof impossible, did not have a fair market value, capable of being ascertained with reasonable certainty, when they were acquired by the taxpayers. In the absence of such value, the ownership of the shares did not lay the basis for the computation of a gain at the time they were received, or for a tax as of that date under the applicable statute. Section 202 (b). Treasury Regulations 45, art. 1563. See also Schuh Trading Co. v. Commissioner, 95 Fed. (2d) 404, and Propper v. Commissioner, 89 Fed. (2d) 617. The evidence in this case, we think, not only fails to establish that the 80,000 shares of Electrol-Delaware common stock which decedent received in the reorganization (if such it was) had any ascertainable fair market value at *100 the time of their receipt - a matter in which the burden of proof rested upon the respondent, see C. A. Reis, 1 T.C. 9 - but does show affirmatively that those shares at the time of their receipt by decedent had no ascertainable fair market value. The fact that the shares in question acquired a market value before the close of the taxable year, after they were freed from the restrictive provisions of the escrow agreement, does not affect our question. The crucial date here is the date of the receipt of the shares by decedent. That is when the alleged taxable transaction occurred. The mere appreciation in value of those shares does not result in taxable gain. Our determination that the shares in question had no ascertainable market value when received by the decedent makes it unnecessary for us to consider the Commissioner's contention that the decedent received his shares as compensation for services rendered or petitioner's further contention that he received them in a nontaxable exchange within the meaning of section 112 (b) (5), since in any event the receipt of the shares without a fair market value did not result in a taxable gain in 1936 which *101 decedent omitted from his income tax return for that year. The proposed additional assessment is barred by the statute of limitations under the general provisions of section 275 (a), Revenue Act of 1936. Decision of no deficiency will be entered.